**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

DEBRA L. JENSEN,             )
                                 )
          Plaintiff,       )
                                 )     No. 2:04-CV-284 PS
          v.                )
                                 )
HARRAH'S INDIANA CASINO CORP.,  )
                                 )
          Defendant.     )

## OPINION AND ORDER

Plaintiff Debra Jensen worked for Defendant Showboat Marina Casino Partnership ("Showboat")[1] for nearly seven years, with her last year in a part-time position. With a new supervisor on the scene, Jensen's part-time position was eliminated and she was told to re-apply for a full-time position if she wished to continue working for Showboat. Jensen refused, and therefore was not reinstated into a full-time position. Jensen sued Showboat, alleging age discrimination under the Age Discrimination in Employment Act of 1967 (ADEA). Before the Court is Showboat's Motion for Summary Judgment. Because Jensen cannot point to any similarly situated individuals and cannot show that Showboat's stated reason for termination was pretextual, Showboat's Motion for Summary Judgment [Doc. 33] is granted.

---

[1] Defendant Showboat was incorrectly sued as "Harrah's Indiana Casino Corp." (*See* Def.'s Answer at 1.)

# I. FACTUAL BACKGROUND

## A.    Jensen's Employment with Showboat

Showboat hired Jensen, who was born on July 3, 1956, as a Table Games Supervisor on March 24, 1997. (*See* Jensen Dep. at 8-9; D 118.) Jensen was approximately 40 years old when she was hired as a Supervisor. (*See id.*) She was one of about 70 salaried Table Games Supervisors whose responsibilities included overseeing a section of the casino, watching the dealers and players, performing customer service, and evaluating and training dealers. (*See id.* at 18, 26; Clay Decl. ¶ 11 and Ex. 2.) Jensen reported to a Casino Manager, who in turn reported to the Director of Table Games. (*See* Clay Decl. ¶ 12.)

In early 2000, Jensen was given the responsibility of coordinating the dealers' schedules. (*See id* at ¶ 5 and Ex. 1.) Showboat pays dealers hourly and employs both part-time and full-time dealers. (*See id.* at ¶¶ 8-9.) Jensen received regular pay raises during her employment at Showboat. (*See, e.g.*, Jensen's personnel file at D 115-116.) She also received performance reviews that stated that she met and/or exceeded Showboat's standards, and letters and awards praising her work performance. (*See id. passim.*)

### 1.    Jensen's Part-time Employment

In September 2002[2], she informed the then-Director of Table Games Roy Guasch that she was quitting her position as Table Games Supervisor so she could pursue her own business. (*See* Jensen Dep. at 23-25; Clay Decl. ¶ 13 and Ex. 3.) In response, Guasch offered Jensen a part-time position, which allowed her to stay at Showboat and also pursue her own business. (*See*

---

[2] Plaintiff, in her Response, claims that she began part-time work in June 2003. (*See* Pl.'s Resp. at 3.) But according to Jensen's deposition and her personnel action notice, the accurate date is September 2002. (*See* Jensen Dep. at 23; Clay Decl. ¶ 13 and Ex. 3.)

Jensen Dep. at 25.)  Specifically, Guasch created a part-time Table Games Supervisor position

for Jensen that required her to work only half (20) the hours of the rest of the Table Games

Supervisors (who worked 40 hours per week).  (*See id.* at 23, 25-26; Clay Decl. ¶ 13 and Ex. 3.)

Jensen was paid exactly half of her original pay.  (*See* Clay Decl. ¶ 13 and Ex. 3.)  It was out of

the ordinary for a Table Games Supervisor to be part-time; all other Table Games Supervisors,

except for Jensen, worked full-time.  (*See* Jensen Dep. at 27.)  Jensen would continue to work in

scheduling Table Games Dealers.  (*See id.* at 25.)  Offered this option, Jensen agreed to stay.

(*See* 1/29/04 Tr. at P 25.)  Guasch did not require Jensen to apply or fill out any transfer form for

the newly-created part-time position.  (*See* 1/29/04 Tr. at P 25, P 30.)  Instead, Guasch

coordinated all the changes.  (*See id.*)  Specifically, a personnel action notice was filled out that

changed her status from full-time to part-time.  (Clay Decl. ¶ 13 and Ex. 3.)

 In September 2003, Joseph Barrett replaced Guasch as the new Table Games Director.

(*See* Barrett Dep. at 7.)  Barrett decided to make two significant changes in the department of

Table Games that directly affected Jensen.  First, Barrett found that supervisors at Showboat

typically worked 45 hours per week.  (*See* Barrett Decl. ¶ 3.)  The one exception to the 45-hour

week was Table Games, which, under Guasch, did not conform to the 45-hour work week.  (*See*

*id.*)  Barrett therefore decided that the Table Games Supervisors would begin to work 45 hours

per week.  (*See id.* at ¶ 4.)

 Second, Barett determined that too many people were handling the Table Games Dealers'

scheduling.  (*See id.* at ¶ 2; Barrett Dep. at 8.)  Barrett therefore decided that he preferred only

one full-time supervisor to have responsibility for scheduling.  (*See* Barrett Dep. at 8.)

Showboat told Jensen she would return to the casino floor (instead of performing the dealer scheduling duties) during her evaluation in December 2003.  (*See* Clay Decl. ¶ 14 and Ex. 4.)  Around the same time, Barrett told Jensen she would need to work 22.5 hours a week rather than 20 hours to remain consistent with the schedule of her fellow full-time Table Games Supervisors, which had been increased to 45 hours a week.  (*See* Jensen Dep. at 65-66.)

Jensen received her December 2003 evaluation from her immediate supervisor, Casino Manager Josie Mathervorn.  (*See* 1/29/04 Tr. at P 28; Clay Decl. ¶ 14 and Ex. 4.)  She initially received a mid-range rating of "Successful."  (1/29/04 Tr. at P 28.)  Jensen requested a re-assessment, and ultimately received a "Highly Successful" rating.  (*Id.* at P 29.)

As directed, Jensen returned to the floor as a part-time Table Games Supervisor in January 2004.  (*See* Clay Decl. ¶ 14 and Ex. 4.)  Jensen was "frustrated" by the change to her responsibilities and by having to work the additional 2.5 hours per week.  (Jensen Dep. at 65-66.)  She originally told management that she should not have to work these additional hours,  but ultimately agreed even though she was "aggravated" by having to work the extra hours.  (*Id.*)

After these changes had been implemented, Jensen, in a chance meeting with a co-worker, Cashier Shift Manager William Krebs, initiated a strong criticism of Showboat and its management.  (*See id.* at 66; Krebs Decl. and Ex. 1.)  Jensen started the conversation by stating, "I hate this fucking job."  (Jensen Dep. at 67.)  She also stated that it was "incredibly sad" that "everyone is so miserable at Harrah's."  (*Id.* at 66.)  Jensen also told Krebs about another Showboat employee who was miserable.  (*Id.* at 66-67.)  This conversation took place in a hallway that served as a major thoroughfare for employees going to and from work in the casino. (*See* Krebs Decl. ¶ 4.)

Krebs, after consulting with Casino Manager Crystal Kessler, sent an e-mail to Barrett describing his encounter with Jensen. (*See* Krebs Decl. ¶ 3 and Ex. 1.) Upon receiving the e-mail on January 24, 2004, Barrett was dismayed that the angry statements came from "the same employee we bent over backwards for to accommodate her part-time salaried position." (Barrett Dep. at 24 and Ex.)

Barrett and Jensen's direct supervisor, Casino Manager Josie Mathervorn, met with Jensen later on January 24, 2004. (*See* Jensen Dep. at 51.) Barrett confronted Jensen with Krebs' allegation and told her that it violated Showboat's Code of Conduct, which prohibits the use of "obscene, profane or abusive language including malicious gossip" and requires Showboat employees to "refrain from lewd or obscene conduct." (*See id.* at 51-53, 80-81 and Ex. 5.) During that meeting, Jensen complained about her work schedule. (*See* Barrett Dep. at 26.) Barrett ended the meeting by suspending Jensen pending investigation.[3] (*See* Jensen Dep. at 53.) After the meeting, Barrett decided to eliminate Jensen's part-time position entirely because it was "not working" for either Jensen or Showboat. (Barrett Dep. at 26-27; Barrett Decl. ¶ 6.)[4]

---

[3] Parties dispute certain details regarding the suspension. These details are inconsequential in the analysis regarding Plaintiff's claim of age discrimination.

[4] Jensen, in her Response to the Motion for Summary Judgment, claims that she began to work as a ***full-time*** Table Games Supervisor from January 23, 2004 through her suspension. (*See* Resp. at 4.) However, this assertion is not confirmed by Jensen's employee check history, the exhibit submitted by Jensen in support of this contention. The exhibit indicates that Jensen's status was part-time from January 1, 2004 through her termination. (*See* Pl.'s Ex. D at D 4460.) Also, Jensen's employee check history for September 1, 2003 through December 31, 2003 (when Jensen was undisputedly part-time) is similar to Jensen's history for 2004. (*See id.* at D 4458-59.) Therefore, this exhibit confirms that Jensen did not return to full-time work at Showboat in 2004.

## 2.     Elimination of Jensen's Part-time Position

On January 29, 2004, Jensen met with Showboat Casino Manager Crystal Kessler and Manager of Employee Relations Laura Corpus.[5]  (*See* Jensen Dep. at 55.)  Corpus informed Jensen that her part-time position was being eliminated.  (*Id.* at 55-56.)  Corpus instructed Jensen that if she wished to continue to work for Showboat, she would need to apply – via a transfer request – for a full-time supervisor position pursuant to Showboat's policy.  (*Id.* at 57-58; 1/29/04 Tr. at P 25-27, P 30.)  The reason given for this requirement was: "[a] status change requires a transfer form."  (1/29/04 Tr. at P 30.)  Jensen stated at the meeting that she wished to continue working as a supervisor for Showboat.  (*Id.* at P 25.)  Corpus stated that if Jensen did not apply for the full-time Table Games Supervisor position she was effectively resigning from Showboat.  (*Id.* at P 26.)  Jensen responded that she did not want to resign and did not understand why she had to apply for a position (Table Games Supervisor) that she currently had. (*Id.* at P 26-27.)  Towards the end of the meeting, Jensen stated:

> I like my job at Harrah's and if I am asked to work full-time in the job that I already have, my title has never changed, then I would be happy to do that.  I don't understand why that is not an option.  Why do I have to apply for a position that I already have?

(*Id.* at P 30.)  The response was: "because you don't have a full-time position you have a part time position."  (*Id.*)

At the time, there was two openings for a Party Pit Table Games Supervisor, which involved the same duties and base salary as a Table Games Supervisor.  (*See* Clay Dep. at 28-30 and Ex. C at D 4213-4216.)

---

[5]  Jensen surreptitiously recorded the January 29, 2004 meeting with Corpus and Kessler. (*See* Jensen Dep. at 63.)  She also typed a transcript of the meeting.  (*See id.* at 67; 1/29/04 Tr.)

Jensen did not apply for the position of Party Pit Table Games Supervisor or any other position at Showboat.  (*See* Jensen Dep. at 57-58.)  Accordingly, because Jensen did not apply, her employment ended on February 5, 2004 during a meeting with Barrett.  (*See id.* at 74-75; Clay Decl. ¶ 17 and Ex. 6.)  She was coded as "eligible for rehire" in the papers documenting her termination.  (Clay Decl. ¶ 17 and Ex. 6.)  Jensen has not applied for employment with Showboat subsequent to February 5, 2004.  (*See* Jensen Dep. at 9.)  After Jensen left, the Part-Time Table Games Supervisor position she had occupied remained closed and was never re-opened or filled. (*See* Clay Decl. ¶ 18.)  Jensen was not aware of any other supervisors or managers whose jobs were eliminated like hers was.  (*See* Jensen Dep. at 62-63.)  She was likewise unaware of whether employees whose jobs were eliminated were required to complete transfer forms for new positions.  (*See id.*)

## B.    Showboat's Employment Policies and Procedures

Showboat has various regulations, policies and procedures with respect to its employees. Two of Showboat's policies are at play here, one dealing with internal transfers and the other dealing with "Personnel Authorization" forms, both of which, according to Showboat, are used when an employee's status changes.   The policy dealing with internal transfers governs when employees seek to transfer jobs within Showboat.  (*See* Pl. Ex. B at 226.)  Certain forms have to be completed by the employee seeking the transfer.  (*See id.* at 227.)  According to the transfer policy, in addition to the internal transfer request form, a "Personnel Authorization" form must also be completed.  (*See id.* at 228.)

Jensen contends that only a Personnel Authorization form had to be completed to change her status from part-time to full-time.  (*See* Pl.'s Resp. at 14.)  She points to the fact that this was

all she had to do when she changed her status from full-time to part-time in September 2002 under the prior supervisor, Guasch. (*See id.* at 13.) Showboat says that Guasch got it wrong and that Jensen needed to have both forms completed: the internal transfer request form and the personnel authorization form. (*See* Clay Dep. at 44.) In any event, what is beyond dispute is that Showboat communicated to Jensen its interpretation of its policy. Although it differed with her interpretation, Showboat made it clear that she needed to complete an internal transfer request form. Jensen admits that this was clearly communicated to her. (*See* Pl.'s Resp. at 7-8; 1/29/04 Tr. at P 25-26, P 30-31.)

Showboat's position that if Jensen wanted to become a full-time Table Games Supervisor that she would have to fill out a transfer form was not made up from whole cloth. (*See* Clay Decl. ¶¶ 32-34 and Ex. 9.) Specifically, Showboat asserts that its policy requires that employees who wish to obtain a new position or change their employment status submit an application for an open position in the form of an internal transfer request. (*See id.*; Clay Dep. at 38, 40-41, 53-55.) Showboat's Policy and Procedure Manual details the steps required when an employee seeks to obtain a new position or change his or her status. (*See* Clay Decl. ¶ 32 and Ex. 9.) Under the policy, a position needs to be "opened." (*Id.* at ¶ 33 and Ex. 9.) This is accomplished by a requisition initiated by a department manager and submitted to Human Resources for approval. (*See id.*)

Showboat generally follows this policy, but allows exceptions to the requirement of submitting transfer requests in certain special circumstances. (*See id.* at ¶ 34.) For example, Showboat employs many part-time dealers. After part-time dealers work 30 hours per week for 6 months, they are automatically sent a form allowing them the option of becoming full-time

dealers.  (*See id.* at ¶ 35 and Ex. 10.)  When a part-time dealer accepts this offer, the dealer changes status to a full-time position without the need of a transfer request.  (*See id.*)  Also, occasionally an employee requests part-time status as part of an illness or family medical leave accommodation.  (*See id.* at ¶ 36.)  Upon the end of the accommodation period, the person is allowed to return to full-time status without completing a transfer form.  (*See id.*)

Also, as in many large organizations, sometimes Showboat managers took shortcuts and did not require an employee to fill out a transfer form in the event that the manager wished to accommodate or do a favor for the employee.  (*See* Clay Dep. at 44-45, 54-55.)  But whenever Byron Clay, Showboat's Vice-President of Human Resources, found a manager or employee trying to change a job status without following the internal transfer request procedure, he stopped the position change and made the manager and employee go back through the proper procedures.  (*See* Clay Dep. at 58.)

**C.      Showboat's Recruiting and Training Program for Table Games Supervisors**

During the time period relevant to this litigation, Showboat faced a shortage of recruits for the Table Games Supervisor positions.  (*See* Clay Decl. ¶ 20.)  A natural training ground to become a Table Games Supervisor was to be a dealer first.  (*See id.* at ¶ 19.)  But Showboat was having difficulty convincing dealers to apply for management positions because the perception was that the increased responsibility was not worth the modest increase in compensation. (*See id.* at  ¶ 21.)  In the fall of 2003, Showboat management decided that it would recruit at colleges and put in place a Table Games Supervisor training program.  (*See id.* at ¶ 23; Clay Dep. at 9.)  In the process of developing the recruitment and training program, Showboat ensured that internal candidates would also be eligible to participate in the program.  (*See* Clay Decl. ¶¶ 25, 26 and

Ex. 7.)  Showboat made this decision because it was not seeing enough interest in the Table Games Supervisor positions internally from dealers or externally from supervisors from other casinos.  (*See id.* at ¶¶ 19, 20.)

Showboat began this new recruitment initiative in the end of 2003.  (*See id.* at ¶ 29.)  By January 2004, according to Showboat, it had assembled a group of twelve potential supervisors for initial training, and hired these twelve supervisors.  (*See id.*)  Each of these twelve individuals submitted applications and interviewed for the positions prior to being hired.  (*See id.*)  Showboat maintains that these 12 recruits were hired as supervisors to fill open supervisor positions.  (*See id.*)

Out of the twelve recruits, three individuals were over 40 years old and were hired during the time period Showboat conducted the new recruiting and training program.  (*See* Clay Decl. ¶¶ 30-31; Clay Dep. at 73-75; Corpus Dep. at 35-36.)  Two of these over-40 hires included Chuck Spudic (born on December 4, 1949) and Patrice Donnowitz (born on September 25, 1955).  (*See* Clay Dep. Ex. F at D 4356; Clay Decl. ¶ 15 and Ex. 5 at D 2351.)  Both were managers in Showboat's Food and Beverage area, who expressed a desire to move to Table Games.  (Clay Dep. at 73-75.)  Because these two individuals were unfamiliar with dealing and table games operations, they participated in the training program along with the college recruits.  (Clay Decl. ¶ 31.)  Spudic completed a transfer form and received full-time work as a Table Games Supervisor on February 9, 2004 – within one week of the elimination of Jensen's part-time position.  (*See* Clay Decl. ¶¶ 15, 16 and Ex. 5 at D 2351 and Ex. 7.)  The third new recruit who was over forty years of age was Eli Erkman (born on June 30, 1959) who was hired on March 15, 2004 as a Party Pit Table Games Supervisor.  (Clay Decl. ¶ 30 and Ex. 8.)

Jensen, in her Response, details nine individuals in the college recruitment program, all of whom were under 40 years old; eight were in their twenties and one was thirty-three. (*See* Pl.'s Resp. at 5.) She claims that Showboat hired its candidates from the training program as Table Games Supervisors on March 19, 2004. (*See* Pl.'s Ex. H.) She also contends that Showboat had only one Table Games Supervisor position available when Showboat hired these individuals. (*See* Pl.'s Ex. I.) Therefore, according to Jensen, Showboat did not have enough openings for all the new hires.

Showboat, however, claims that it actually hired these individuals on January 26, 2004, which, according to Showboat, is supported by even Jensen's exhibits. (*See* Def.'s Reply at 3-4.) Thus, these individuals filled positions that were available prior to January 26, 2004. (*See* 2/21/06 Barrett Decl. ¶¶ 3-5 and Ex. 1.) Although the January 2004 hires did not become full-functioning supervisors until March 2004, they filled open Table Games Supervisor positions in January 2004. (*See id.* at ¶ 4.)

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

The nonmovant cannot rest on the pleadings alone or upon conclusory allegations in affidavits, "but must identify specific facts," *Cornfield v. Consol. High Sch. Dist. No. 230,* 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a "scintilla of evidence" to show a genuine triable issue of material fact, *Murphy v. ITT Educ. Servs., Inc.,* 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Tatalovich v. City of Superior,* 904 F.2d 1135, 1139 (7th Cir. 1990) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

The ADEA precludes employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . ." 29 U.S.C. § 623(a)(1). In an ADEA case, an employee can defeat summary judgment by presenting direct evidence of discrimination. If there is no direct evidence, she may still defeat summary judgment by utilizing the indirect, burden-shifting approach defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Since Jensen presents no direct evidence, she must first establish a *prima facie* case of discrimination under the *McDonnell Douglas* test.

To establish a *prima facie* case of age discrimination using the indirect method, a plaintiff must demonstrate that: (1) she is a member of a protected class forty years of age and older; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) substantially younger, similarly situated employees were treated more favorably. *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002); *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 322 (7th Cir. 2001). Once the plaintiff establishes a *prima facie* case of age

discrimination, the employer, to avoid liability, must then produce a legitimate, nondiscriminatory reason for the employee's termination.  *See Wade*, 243 F.3d at 323.

If the employer offers a legitimate, nondiscriminatory explanation for the termination, the plaintiff must then rebut that explanation by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual.  *See id.*  Pretext "means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks."  *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000).

Jensen fails to establish a *prima facie* case because she does not demonstrate that Showboat treated similarly situated but significantly younger persons differently than it treated her.  Further, she cannot establish that Showboat's explanation is pretextual.

### A.  *Prima Facie* Case

Jensen meets the first three prongs of her *prima facie* case.  She was 48 years old when the alleged discrimination occurred and was performing her job satisfactorily.  She also suffered an adverse employment action when her part-time Table Games Supervisor position was eliminated and she was required to re-apply for a full-time supervisory position.  Showboat argues that Jensen suffered no adverse employment action simply because it required Jensen to adhere to its transfer request policy and apply for a full-time position.  (Def.'s Mem. at 11-12.) But that is not the whole story.  Not only did Showboat require Jensen to fill out additional paperwork, but more significantly, it eliminated her part-time position.  This amounts to an adverse employment action.

Jensen however has failed to establish the fourth prong of the *McDonnell Douglas* test. This part of the analysis requires Jensen to point to younger employees who were "similarly situated [to her] with respect to performance, qualifications, and conduct[.]" *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003). Jensen must then show that Showboat treated these younger employees more favorably than her "in all material respects[.]" *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

In attempting to establish this prong, Jensen points to the nine recent college graduates who were hired by Showboat in its new training program as Table Games Supervisors. In reality, the new hires actually consisted of twelve people, three of whom were over the age of 40 and two of whom were transfers from other departments within Showboat. Jensen attempts to focus the Court's attention to only the nine recent college graduates. But this potential comparison mixes apples with oranges. As the Seventh Circuit has stated, "In determining whether [ ] employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citation omitted). The nine individuals were all new employees to Showboat. None of them was like Jensen who was asked to transfer to a new position within Showboat. To be similar, Jensen must point to an existing employee who sought a change in employment status and who was not subject to the requirement of filling out a transfer request as she was. *See id.* at 615, 618 (finding that plaintiff, who alleged that defendant failed to assist him to same extent as other employees in finding vacancies after his position was eliminated as part of a reduction in force (RIF), was not "in materially parallel positions" as employees who were not subject to RIF).

Moreover, Jensen was substantially dissimilar to the nine recruits in another important way. She and Barrett had established a poor relationship from the beginning of Barrett's tenure. She was upset about the additional hours required of her and the move from scheduling to the casino floor. For his part, Barrett was dismayed by Jensen's swearing outburst and her complaints regarding her hours. There is nothing in the record (and there couldn't be as these were recent full-time hires) to indicate that the nine individuals had any similar history with Barrett. These distinctions are sufficient to materially distinguish Jensen from the recruits. *See id.* at 618-19 (concluding that plaintiff who had prior job performance problems and communicated to defendant he planned to leave was "materially different" from other employees).

Finally, even if the nine new recruits are potential comparators to Jensen, they are dissimilar to her in yet another way. The nine new recruits all properly filled out the appropriate paperwork to obtain the position of Table Games Supervisor. Jensen, on the other hand, refused to complete the paperwork particular to her situation. Thus, the nine new hires were not treated more favorably than Jensen was.

The most apt comparison for Jensen is the one recruit to the Table Games Supervisor position (Chuck Spudic) who was already an employee of Showboat but who was – like Jensen – changing his position. Jensen ***was*** similarly situated to Spudic who was transferring from Showboat's Food and Beverage Department. The problem for Jensen is that Spudic is seven years older than she is, and the record indicates that Spudic completed a transfer form to become

a full-time Table Games Supervisor, just as Jensen was asked to do.[6]  Thus, Jensen was treated

identically to the new Table Games Supervisor who was most similar to her.  Showboat required

both Jensen and Spudic to fill out the appropriate transfer forms.  Spudic complied; Jensen did

not.  Showboat therefore did not treat similarly situated individuals differently.

None of the evidence presented by Jensen establishes that there were any similarly

situated younger employees who were treated differently than her.  In fact, Jensen has admitted

that she is unaware of any other supervisors or managers whose jobs were eliminated, and did

not know whether employees whose jobs were eliminated were required to apply for new

positions.  Jensen also did not provide any examples of management employees who changed

their employment status without completing internal transfer request forms.  Thus, she has not

fulfilled the "similarly situated" prong of the *McDonnell Douglas* test.

### B.  Pretext

Even if the Court were to assume for the purposes of this Motion that Jensen could make

her *prima facie* case, her claim fails because Showboat has put forth legitimate reasons for

eliminating her position and requiring her to fill out a transfer form and Jensen has not shown

that these reasons were pretextual.

Showboat had legitimate reasons, unrelated to age, for each decision it made regarding

Jensen.  First, Showboat justified eliminating Jensen's part-time position by reasoning that the

arrangement was not working for Jensen or Showboat.  In her response, Jensen does not question

Showboat's reasons for eliminating her part-time position.

---

[6]  A second internal employee, Patrice Donnowitz, also became a Table Games
Supervisor at that time via an internal transfer.  She too was older than Jensen.  Jensen has failed
to prove that either Spudic or Donnowitz did not complete the appropriate transfer request forms.

Second, Showboat had a legitimate reason for requiring Jensen to complete a transfer request to a full-time position. Simply, this requirement was mandated by Showboat policy. It is reasonable for employers to establish policies for transferring employees and then to require employees to adhere to the policies. When openings arise within an organization, requiring existing employees to apply for the openings is entirely reasonable. It allows the employer to consider all qualified internal applicants and prevents supervisors from playing favorites and sidestepping the merit selection process. (*See* Clay Dep. at 62-63; Pl.'s Ex. B at 226-228.)

Because Showboat has established legitimate non-discriminatory reasons for its decisions, Jensen now has the burden to establish that these reasons for eliminating her part-time position and requiring her to complete transfer paperwork for a full-time position were pretextual. To do so, Jensen must bring forth evidence demonstrating that the decision-maker was lying to cover up his own desire to take action against Jensen because of her age. *See Grube v. Lau Indus. Inc.*, 257 F.3d 723, 730 (7th Cir. 2001).

To attempt to establish pretext, Jensen argues that Showboat did not actually have a policy in place requiring completion of an internal transfer form when changing employment status. She claims that Showboat's handbook and policy and procedure manual do not disclose that employees are required to complete internal transfer forms for a change in part-time or full-time status. (*See* Pl.'s Resp. at 1-2.) But it is equally true that they don't say the contrary; at best, the transfer section of the manual is silent on the issue.

To prove that her interpretation of the manual is correct, Jensen points to the fact that Guasch, her former supervisor, did not require her to complete the transfer forms when she went from full-time to part-time. (*See id.* at 13.) Showboat claims that Guasch violated policy by not

17

requiring the transfer forms be completed. Its discovery responses advised Jensen that both personnel action forms and internal transfer forms are required when changing employee status. *(See* Def. Resp. to 2nd Request for Doc. Nos. 5 and 6.) Deposition testimony also supported Showboat's interpretation of its own policies. For example, Byron Clay, Showboat's Vice President of Human Resources, testified that Showboat required transfer forms to be completed when employees changed status and when he caught supervisors trying to sidestep the procedure, he stopped the position change and made the applicant go through the proper procedures.

The parties may dispute whether Showboat has a clear policy requiring employees to complete internal transfer forms when changing employment status. But this is not a dispute about a material issue of fact because the Court need not resolve whose interpretation of Showboat's policy is correct. Showboat made a reasonable interpretation of its policies and communicated its interpretation to Jensen. She refused to comply with the simple request made of her and she was terminated as a result.

Thus, the question Jensen must answer is – was Showboat's request that Jensen adhere to its interpretation of its own policies a pretext for age discrimination? Unfortunately for Jensen, she has not provided any evidence of such a pretext. Nothing in the record suggests that anyone from Showboat lied about the policy in order to terminate Jensen because of her age. Nor does the evidence suggest that the decision maker, Barrett, did not "honestly believe" that he was justified in not giving the position to a person who refused to apply for it. *See Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000) (provided the employer "honestly believed" the reason given for the action, pretext has not been shown). In any event, even if Barrett made a

mistake, simply showing a possible error does not establish pretext. *See Kulumani*, 224 F.3d at 685 ("[P]retext means a dishonest explanation, a lie rather than an oddity or an error.").

Jensen also tries to show pretext by claiming that Barrett terminated her to open up a position for one of the young college graduate recruits. To begin with, Jensen's contention does not make sense because it is difficult to conceive how eliminating one part-time position creates nine full-time positions. In any event, her claim concerning Barrett's motives is mere speculation, and Jensen has not submitted any evidence that supports this contention. *See Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) (finding that plaintiff's "unsupported speculation" of pretext does not illustrate that defendant discriminated on the basis of national origin); *Grube*, 257 F.3d at 730 ("Quite simply, [plaintiff's] speculation (and that is all that it is) cannot stand to demonstrate pretext.").

The evidence is to the contrary. Chuck Spudic, a 51-year old internal candidate, completed an internal transfer request form and was hired on February 9, 2004 – within a week of the elimination of Jensen's part-time position. Two other individuals, both of whom were over 40, were hired as Table Games Supervisors around the same time that Jensen left Showboat. Eli Erkman, a 46-year old external candidate, filled one of two available Party Pit Table Games Supervisor positions on March 15, 2004. And Patrice Donnowitz, who was a year older than Jensen, transferred from the Food and Beverage Department around that same time. It is difficult to conceive how getting rid of Jensen was motivated by her age when three of the new hires were also over 40.

Finally, Jensen argues that she was essentially between a rock and a hard place. If she completed the transfer form, Barrett had the ability to deny the transfer leaving Jensen without a

job; if she refused to complete the transfer, Barrett could terminate her for failing to complete the form. (*See* Pl.'s Resp. at 15.) This may well be true but these hypothetical situations do not establish pretext for age discrimination. Showboat made a reasonable request of her based on its interpretation of its own policies. Jensen needed to take affirmative steps (that is, fill out an internal transfer form) before she can allege a discriminatory motive. *See Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) ("[I]n order to be probative of an intent to discriminate, evidence of failure to transfer must include proof that the employee was qualified for ***and applied for*** specific jobs that were available . . . ." (emphasis added)).

Finally, although not raised by either party, it is necessary to discuss *Gordon v. United Airlines, Inc.,* 246 F.3d 878 (7th Cir. 2001). Although *Gordon* appears to resemble this case, on close examination we find that nothing in that case mandates a different result here. In *Gordon,* a flight attendant was terminated for making an unauthorized deviation from his schedule which was against company policy and which caused him to miss a flight. In that case, there was a factual dispute as to whether the employee was told prior to him taking the unauthorized deviation that it was against company policy. *See id*. at 892. Because there was a dispute as to what the employee was told in advance of his transgression, the Seventh Circuit held that the district court erred in granting summary judgment for the employer. Thus, the Seventh Circuit found that there were questions of fact as to whether the employer's reliance on the policy in discharging the employee was a pretext. *See id.* at 893.

In this case, this is no such factual dispute. The record is abundantly clear that Jensen was told in no uncertain terms that she had to fill out the transfer paperwork to be considered for the full-time Table Games Supervisor position. She merely disagreed with Showboat's

interpretation of the policies and obstinately refused to complete the transfer form.  Her case is thus distinguishable from *Gordon*, where the employee was sent mixed signals as to whether the policy at issue applied to him at all.

In sum, Jensen cannot point to any evidence showing that Barrett's decision to eliminate Jensen's part-time position and to require her to apply for a full-time position were made because she was over 40.  *See Cardoso*, 427 F.3d at 436 ("The aggrieved employee may seek recourse in federal court for discrimination only for the forbidden reasons . . . , not for common workplace disputes or poor, nonsensical, or even heavy-handed management techniques or decisions.").  As long as Barrett's decisions were not implemented as a pretext to discriminate against Jensen because of her age – and this is no evidence that they were – the Court cannot conclude that Showboat acted with a discriminatory intent.  Jensen has not met her burden of showing that Showboat's proffered reasons were lies to cover up an age discriminatory motivation; hence, her ADEA claim cannot proceed past summary judgment.

### III.  CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment [Doc. No. 33] is **GRANTED**.  The clerk shall **ENTER FINAL JUDGMENT** in favor of Defendant Showboat Marina Casino Partnership, stating that Debra Jensen is entitled to no relief.  The clerk shall treat this civil action as **TERMINATED**.

**SO ORDERED.**

ENTERED: June 26, 2006

                              s/ Philip P. Simon
                              PHILIP P. SIMON, JUDGE
                              UNITED STATES DISTRICT COURT